UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X

STEPHEN BAROUNIS,

                Plaintiff,

    - against -

NEW YORK CITY POLICE
DEPARTMENT, LIEUTENANT JOSE
MEDINA, in his official and individual
capacities, and LIEUTENANT LUIS
ALGARIN, in his official and individual
capacities,

                Defendants.
------------------------------------------------------- X

**OPINION AND ORDER**

**10 Civ. 2631 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

Stephen Barounis, a Sergeant on pre-retirement leave from the New York City Police Department ("NYPD"), brings this action against defendants NYPD, Lieutenant Jose Medina ("Lt. Medina"), and now retired Lieutenant Luis Algarin ("Lt. Algarin"), alleging claims of race and age discrimination, hostile work environment, retaliation, and constructive discharge in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL")[1] and the New York City Human Rights Law ("NYCHRL").[2]

---

[1]     N.Y. Exec. Law § 296.

[2]     N.Y.C. Admin. Code § 8-107(1)(a).

Defendants now move for summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure on the following grounds: (1) failure to establish a prima facie case of race or age discrimination; (2) failure to rebut the NYPD's legitimate non-discriminatory reasons for the employment actions taken against him; (3) failure to establish that the alleged harassing conduct by Lts. Medina and Algarin constituted a hostile work environment; (4) failure to establish a prima facie case of retaliation; (5) failure to establish a constructive discharge claim; and (6) failure to establish a prima facie case of race or age discrimination, hostile work environment in violation of the NYCHRL.  For the following reasons, defendants' motion is granted in its entirety.

## II.    BACKGROUND[3]

### A.    Undisputed Facts

Barounis, a Caucasian male, born June 19, 1963, was appointed to the NYPD in January 1985.[4]  In 1998, Barounis was promoted to Sergeant, and from then until his first retirement, Barounis was a Squad Sergeant at the Bronx Task

---

[3]    The following facts are derived from the Complaint and from the parties' Rule 56.1 statements and supporting documents.  The facts are undisputed unless otherwise noted; where disputed, they are construed in the light most favorable to the plaintiff.  *See, e.g.*, *Federal Ins. Co. v. American Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011).

[4]    *See* Barounis's Answer to Defendant's Rule 56.1 Statement of Material Facts ("Pl. 56.1") ¶ 2.

Force, where he worked the midnight tour.[5]  Barounis retired from the NYPD in February 2005.  He testified that he had retired because "after 20 years, you're supposed to leave . . . [i]t's like cop jargon. 20 and out."[6]  On January 20, 2006, Barounis rejoined the NYPD and was assigned to the Bronx Task Force as a Sergeant working the midnight tour.[7]  In 2006, Captain ("Cpt.") Thomas Traynor, a Caucasian male, was the Commanding Officer ("CO") of Barounis's unit;[8]  Lt. Algarin, an Hispanic male, was the Integrity Control Officer ("ICO").[9]  In 2007, Lt. Chris Batignani, a Caucasian male, became Barounis's platoon supervisor.  In February, 2007 Lt. Medina, an Hispanic male, was assigned to the Bronx Task Force and became the ICO in 2008 after Lt. Algarin resigned the position.[10]

### B.      Discrimination by Lt. Algarin and Lt. Medina

---

[5]      *See* Defendants' Rule 56.1 Statement of Undisputed Facts ("Def. 56.1") ¶ 4.

[6]      *See* 12/29/10 Deposition of Stephen Barounis ("Barounis Dep."), Ex. N7 to the Declaration of Donna Canfield, defendants' counsel, in Support of Motion for Summary Judgment ("Canfield Decl.") at 58:1-9.

[7]      *See* Def. 56.1 ¶ 6.

[8]      *See id.* ¶ 13.

[9]      The ICO is in charge of matters related to officer integrity within the unit.  This includes ensuring that officers do not abuse overtime.  *See id.* ¶ 11. Plaintiff disputes that overtime was monitored by the ICO.  *See* Pl. 56.1 ¶ 11.

[10]      *See* Def. 56.1 ¶ 7.

Barounis alleges that beginning in 2007, Lts. Algarin and Medina (the "individual defendants") discriminated against him on the basis of his race and age.[11]  Plaintiff alleges that the individual defendants: (1) made false allegations to the NYPD's Internal Affairs Bureau ("IAB"); (2) unjustifiably prohibited Barounis from working overtime and showed favoritism to Hispanic officers; (3) refused to let plaintiff sign in at the beginning of his shifts; and (4) called him a "criminal" and a "thief" and otherwise tried to force Barounis to retire.[12]

Barounis testified that Lt. Medina questioned him in front of other officers, asking "How old are you" and "It's time for you to get off this job. You're over 20 years" and "it's time for you to go. . . it's a young man's job."[13] Although Barounis could not identify which officers overheard these statements, he testified that they occurred on a daily basis.[14]  Barounis alleges that Lts. Medina and Algarin belittled, harassed, and mocked him in front of his colleagues on a regular basis and that they were "singling [him] out, they're making [his] life

---

[11]     *See* Complaint ("Compl.") ¶¶ 17-25.  Plaintiff acknowledged in his 56.1 response that he provided no examples of discriminatory actions by Lt. Algarin based on his age.  *See* Pl. 56.1 ¶ 40.

[12]     *See* Def. 56.1 ¶ 15.

[13]     Barounis Dep. at 77-78.

[14]     *See id.*

miserable here" and "passed comments to [him] that they're going to force [him] to retire."[15]  Lt. Batignani stated that he had expressed his concerns about Lts. Algarin and Medina's behavior towards Barounis.[16]  However, when asked if Barounis' performance of his duties was interfered with by Lt. Algarin, Lt. Batignani stated that "[i]f his performance was hindered in any way, I didn't see [it] – he was a very good supervisor, so I couldn't see that, you know, it was hindered."[17]  Barounis testified that Lt. Medina commented in front of him and two Hispanic officers that "the good old days of the good old white boys running the show here is over."[18]

Barounis recalls that on one occasion, Lt. Medina mocked him in front of other officers because Barounis decided to close down several streets after one of his officers was injured on the job.[19]  In another instance, Barounis testified that Lt. Medina favored Hispanic officers over Caucasian officers when he changed a roll call assignment.  Two Caucasian officers who had a "knack" for using the

---

[15]     *Id.* at 82-83.

[16]     *See* 12/28/10 Deposition of Cris Batignani ("Batignani Dep."), Ex. N7 to the Declaration of Albert Adam Breud, II, plaintiff's counsel, in Opposition of Motion for Summary Judgment ("Breud Decl.") at 67:22-25.

[17]     *Id.* at 84:16-17.

[18]     *See* Barounis Dep. at 106-107.

[19]     *See* Pl. 56.1 ¶ 19.

plate reader[20] were supposed to be assigned the job, but Lt. Medina assigned it to two Hispanic officers.[21]  Plaintiff alleges that Lt. Medina said "I'm going to take care of some Hispanics, too."[22]

       Barounis contends that on several occasions, the individual defendants requested to review his memo books.  In one instance, one of the memo books was lost after Lt. Algarin claimed he returned it to Barounis.[23]  Barounis alleges that Lt. Algarin took the memo book so that he could issue Barounis a command discipline.  Barounis, in fact, received a command discipline but no penalty.[24]

       Barounis alleges that the individual defendants treated other non-Hispanic officers in an unprofessional manner as well.  Barounis does acknowledge, however, that between 2006 and 2008, the individual defendants issued command disciplines to both Hispanic and non-Hispanic officers alike.[25]

---

[20]     A license plate reader is used by the NYPD as a method to record a vehicle passing through a specific location and then identifying the owner/operator. *See* New York State Division of Criminal Justice Services. *New York State Suggested Guidelines: Operation of License Plate Reader Technology* (2011). http://criminaljustice.state.ny.us/ofpa/pdfdocs/finallprguidelines01272011a.pdf

[21]     Pl. 56.1 ¶ 22.

[22]     Barounis Dep. at 145.

[23]     *See* Pl. 56.1 ¶ 38.

[24]     *See id.* ¶ 39.

[25]     *See id.* ¶ 46.

Barounis also alleges he was treated differently than other officers in that he was issued a minor violation by Lt. Medina for double-parking a radio car.[26]  Although the minor violations log shows that other officers assigned to his unit have been issued violations for the same offense, Barounis maintains he was the only Supervisor to receive one.[27]

Barounis did not initially report the discriminatory actions of Lts. Algarin and Medina to the IAB or the NYPD's Office of Equal Employment Opportunity ("OEEO").[28]  Barounis alleges that once a discrimination accusation is made, a supervisor must report the alleged conduct to the OEEO.[29]

In March 2008, Barounis told Cpt. Traynor that he was going to put in his papers for retirement because of the "mistreatment" he was receiving from Lts. Algarin and Medina.[30]  Barounis chose to retire instead of requesting to be transferred to another command because he believed the transfer process would

---

[26]    *See id.* ¶ 23.

[27]    *See id.* ¶ 25.  Barounis did not lose any overtime or other privileges as a result of the violation.  *See id.* ¶ 24.

[28]    *See id.* ¶ 47.

[29]    *See id.*  Plaintiff contends that on June 19, 2008, he raised these issues during a G.O. 15 hearing.  A G.O. 15 hearing is conducted as part of an internal investigation into a member of the NYPD.  *See* Batignani Dep. at 96:18-25.

[30]    *See* Pl. 56.1 ¶ 51.

take too long.[31]  However, Barounis admits that he did not immediately submit his paperwork for either option.

Other sergeants in the Bronx Task Force witnessed the hostile treatment Lts. Medina and Algarin exhibited toward Barounis.  Sgt. Candia stated he believed that Barounis was discriminated against because of race and age because Lts. Algarin and Medina never treated Hispanic officers the way they treated Barounis and would repeatedly ask Barounis how old he was.[32]  Sgt. Calderon stated that Lt. Algarin told him to "tell him [plaintiff] to put his retirement papers in or they will make his life miserable."[33]  Sgt. Calderon also stated that Lts. Algarin and Medina treated other Caucasian supervisors harshly; they would tell Sgt. Calderon that Barounis should be in jail and that he was a criminal.[34]  Sgt. Calderon also stated "I would also use the terms volatile, toxic, and stressful to describe the work place that they created for Sgt. Barounis."[35]

---

[31]      *See id.* ¶ 52.

[32]      *See* Declaration of Pedro Candia ("Candia Decl."), attached to the Opposition of Motion for Summary Judgment.

[33]      7/2/08 Investigating Officer's Report, Ex. K13 to the Canfield Decl., at 1.

[34]      *See* Declaration of Jose Calderon ("Calderon Decl."), attached to the Opposition to the Motion for Summary Judgment, ¶ 34.

[35]      *Id.* ¶ 45.

Further, Sgt. Calderon stated that Lt. Medina told him "I know who runs this building.  I'm here to take care of Latinos, I'm here to take care of you."[36]

### C.    Overtime Abuse Allegations

On May 6, 2008, the IAB received an anonymous call claiming retaliation and overtime abuse within the Bronx Task Force.[37]  Specifically, it was alleged that Lt. Medina had been removed as ICO of the Bronx Task Force by Cpt. Traynor because Lt. Medina had uncovered overtime abuse by Barounis and Barounis's supervisor, Lt. Batignani.[38]  When interviewed by Detective Shawnee Moore, Lt. Medina claimed that he had reported his concerns regarding Barounis's excessive overtime on several occasions.  Lt. Medina claimed that Lt. Algarin had brought the abuse to his attention and that Lt. Batignani had permitted and authorized the excessive overtime.[39]

During the investigation, the Deputy Inspector for the Special Investigations Unit of IAB requested the overtime reports from members of the Bronx Task Force from December 1, 2005 through April 1, 2008.[40]  It was also

---

[36]    *Id.* ¶ 48.

[37]    *See* Pl. 56.1 ¶ 54.

[38]    *See id.*

[39]    *See id.* ¶ 56.

[40]    *See id.* ¶ 57.

discovered that another investigation was pending against Barounis, also brought about by an anonymous letter to the IAB, for allegedly accruing excessive overtime while working in uniform, on duty, at his brother's bars in Manhattan.[41] In June 2008, Barounis was questioned about these allegations. When asked to produce certain memo books, Barounis was unable to comply, claiming they were never returned to him by the individual defendants. The investigation's report stated that in many instances of overtime requests by Barounis, the entries in the memo books were very limited and Barounis was unable to give additional information as to his whereabouts when performing the overtime.[42] The records show that from January 1, 2006 through December 31, 2006, Barounis accrued 1,431 hours of overtime, making him third on the list of the top four hundred compensatory time earners in the entire NYPD.[43] From January 1, 2007 to December 31, 2007, Barounis accrued 874 hours of overtime, making him fifth on the list. For that same time period, Lt. Algarin accrued 1130 overtime hours and

---

[41]     *See id.* ¶ 58.

[42]     *See id.* ¶ 61.

[43]     *See* Top 400 Compensatory Time Earners from January 1, 2006 to December 31, 2006, Ex. K9 to the Canfield Decl., at 1.

was number three of the top four hundred compensatory time earners.[44]

### D. Investigations into Barounis's Allegations of Overtime Abuse and Harassment by Lts. Medina and Algarin

On June 19, 2008, the OEEO was contacted regarding the allegations of abusive treatment Barounis was experiencing from the individual defendants. The OEEO advised Barounis that his allegations did not rise to the level of employment discrimination.

On June 26, 2008, Lt. Batignani was interviewed about Barounis's issues with Lts. Algarin and Medina. Lt. Batignani stated that although Lt. Algarin had informed him that Barounis slept during his tour, signed in late and left early, he never personally witnessed such conduct. Lt. Batignani also stated that he had seen Lts. Algarin and Medina "tag teaming" Barounis with regards to producing his memo books. Sgts. Calderon and Candia were also questioned about Lts. Medina and Algarin's treatment of Barounis. Both responded that it was an adversarial relationship and both witnessed Barounis being yelled at or singled out on several occasions.[45]

Lt. Medina was questioned on July 2, 2008, about the excessive

---

[44]   *See* Top 400 Compensatory Time Earners from January 1, 2007 to December 31, 2007, Ex. K10 to the Canfield Decl., at 1.

[45]   *See* Pl. 56.1 ¶¶ 74-75.

overtime accusations.  He stated that for many of the overtime requests he had received from Barounis, he did not observe Barounis performing duties that justified the overtime.  Lt. Medina stated that because Barounis had trouble identifying the tasks that required overtime, he instructed Barounis not to perform any overtime unless first informing him.  Lt. Medina said that he had tried to inform Cpt. Traynor of the overtime abuse, but that Cpt. Traynor was unresponsive.[46]  Therefore, he continued investigating on his own, noting that he suspected overtime abuse from Lt. Batignani and Sgt. Candia, a Hispanic male. During the course of his investigation, Lt. Medina said he requested several memo books from Barounis in order to investigate the excessive overtime.[47]

On August 21, 2008, Leeds, Morelli & Brown, P.C. sent a letter to the Commissioner of the NYPD, notifying him that the law firm had been retained by Barounis regarding his allegations of discrimination.[48]  On November 5, 2008, the Chief of Patrol requested that Barounis be transferred out of the Bronx Task Force to the 42 Precinct, effective November 10, 2008.[49]  He was also switched from the

---

[46]     *See id*. ¶ 72.

[47]     *See id.* ¶ 73.

[48]     *See id*. ¶ 78.

[49]     *See id.* ¶ 84.  Plaintiff contends that he was told of the transfer on October 31, 2008.

night shift to the day shift.  As a result of the transfer, Barounis submitted his

intention to retire on November 6, 2008, and began his pre-retirement leave with

an official retirement date of July 22, 2011.[50]  Barounis testified that he knew that

his transfer meant that there was a "target on my back," and that "it was time to

leave for my own safety."[51]  Lt. Medina and Cpt. Traynor were also transferred as a

result of the investigation into overtime abuse.

On November 19, 2008, Barounis was served with Charges and

Specifications that stated that he had: (1) improperly worked beyond his scheduled

tour on non-ordered overtime; (2) improperly adjusted his schedule to commence

work before the start of his scheduled tours resulting in compensatory overtime;

(3) was directed to stop working non-ordered overtime unless specifically directed

to do so (and failed to comply with this order); and (4) failed to maintain and

accurately complete department records including overtime slips and activity

logs.[52]  Barounis was found not guilty of Specifications 1, 2 and 3 and guilty of

Specification 4.  The recommendation was that Barounis be dismissed from the

NYPD, but that the dismissal be held in abeyance for one year, and that he be

---

[50]   *See id.* ¶ 86.

[51]   *Id.* ¶ 87.

[52]   *See id.* ¶ 88.

suspended for thirty days.   On November 20, 2008, Barounis filed a Charge of

Discrimination with the U.S. Equal Employment Opportunity ("EEOC").[53]

## III.   LEGAL STANDARDS

### A.   Summary Judgment

Summary judgment is appropriate "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law."[54]  "For summary judgment  purposes, a 'genuine issue' exists

where the evidence is such that a reasonable jury could decide in the non-moving

party's favor."[55]  "'A fact is material when it might affect the outcome of the suit

under governing law.'"[56]

In a summary judgment setting, "[t]he burden is on the moving party

to demonstrate that no genuine issue respecting any material fact exists."[57]  "When

---

[53]      *See* Charge of Discrimination, Ex. N1 to the Canfield Decl., at 1.

[54]      Fed. R. Civ. P. 56(a).

[55]      *Sanchez v. Connecticut Natural Gas Co.*, 421 Fed. App'x 33, 34 (2d Cir. 2011) (quoting *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000)).

[56]      *Carter v. Incorporated Village of Ocean Beach*, 415 Fed. App'x 290, 292 (2d Cir. 2011) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)).

[57]      *Mavrommatis v. Carey Limousine Westchester, Inc.*, No. 10 Civ. 3404, 2011 WL 3903429, at *1 (2d Cir. Sept. 7, 2011) (citing *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir. 1994)).

the burden of proof at trial would fall on the nonmoving party, it ordinarily is

sufficient for the movant to point to a lack of evidence . . . on an essential element

of the nonmovant's claim."[58]  In turn, to defeat a motion for summary judgment,

the non-moving party must raise a genuine issue of material fact.  The non-moving

party "'must do more than simply show that there is some metaphysical doubt as to

the material facts,'"[59] and cannot "'rely on conclusory allegations or

unsubstantiated speculation.'"[60]

        In deciding a motion for summary judgment, a court must "'construe

the facts in the light most favorable to the non-moving party and must resolve all

ambiguities and draw all reasonable inferences against the movant.'"[61]  However,

"'[c]redibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge.'"[62]

---

[58]    *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

[59]    *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[60]    *Id.* (quoting *Federal Deposit Ins. Corp. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

[61]    *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).

[62]    *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)) (emphasis removed).

"'The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'"[63]

Summary judgment may be proper even in workplace discrimination cases, which tend to be very fact-intensive, because "'the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to other areas of litigation.'"[64]  However, "'[b]ecause direct evidence of an employer's discriminatory intent will rarely be found,' motions for summary judgment in employment discrimination actions should be evaluated with caution."[65]  Nonetheless, a plaintiff bringing a workplace discrimination claim must make more than conclusory allegations in order to defeat a motion for summary judgment.[66]  It is incumbent upon courts to "distinguish between evidence that allows for a reasonable inference of

---

[63]   *Brod*, 653 F.3d at 164 (quoting *Wilson v. Northwestern Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

[64]   *Hongyan Lu v. Chase Inv. Servs. Corp.*, 412 Fed. App'x 413, 415 (2d Cir. 2011) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)). *Accord Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

[65]   *Gear v. Department of Educ.*, No. 07 Civ. 11102, 2011 WL 1362093, at *2 (S.D.N.Y. Mar. 30, 2011) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)).

[66]   *See id.*

-16-

discrimination and evidence that gives rise to mere speculation and conjecture."[67]

And "[a]lthough claims under the NYCHRL are 'more liberally construed than claims under Title VII and the NYSHRL, the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56.'"[68]

## B.    TITLE VII

### 1.    Discrimination

#### a.    Prima Facie Case

Title VII proscribes discrimination against or termination of an individual on the basis of "race, color, religion, sex, or national origin."[69]  "To withstand a motion for summary judgment, a discrimination plaintiff must

---

[67]    *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999).  *Accord Cameron v. Community Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) ("'[P]urely conclusory allegations of discrimination, absent any concrete particulars,' are insufficient" to satisfy an employee's burden on a motion for summary judgment.) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) (alteration in original)).  *Accord Jenkins v. New York State Banking Dep't*, Nos. 07 Civ. 6322, 07 Civ. 11317, 2010 WL 2382417 (S.D.N.Y. Sept. 30, 2010).

[68]    *Ballard v. Children's Aid Soc'y*, 781 F. Supp. 2d 198, 211 (S.D.N.Y. 2011) (quoting *Deshpande v. Medisys Health Network, Inc.*, No. 07 Civ. 375, 2010 WL 1539745, at *22 (E.D.N.Y. Apr. 16, 2010)) (quotation marks omitted).  *Accord Julius v. Department of Human Res. Admin.*, No. 08 Civ. 3091, 2010 WL 1253163, at *5 (S.D.N.Y. Mar. 24, 2010).

[69]    42 U.S.C. § 2000e-2.

withstand the three-part burden-shifting [analysis] laid out by *McDonnell Douglas Corp. v. Green*."[70]  "Under this framework a plaintiff must first establish a prima facie case of discrimination."[71]  To do so, a plaintiff must show: "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to [an] inference of discrimination" based on his membership in the protected class.[72]

An adverse employment action is an action by which a plaintiff "has suffered 'a materially adverse change in his employment status' or in the terms and conditions of his employment."[73]  Examples of adverse employment actions include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities."[74]  "To be 'materially adverse' a change in working conditions must be 'more disruptive than a mere inconvenience

---

[70]     *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

[71]     *Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).

[72]     *Id.* at 492.

[73]     *See Kessler*, 461 F.3d at 207 (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)).

[74]     *Id.* (quotation marks and citation omitted).

or an alteration of job responsibilities.'"[75]  "[A]lthough reprimands and close

monitoring may cause an employee embarrassment or anxiety, such intangible

consequences are not materially adverse alterations of employment conditions."[76]

"Courts have held that negative evaluations . . . without any accompanying adverse

results, are not cognizable."[77]  "[B]eing yelled at, receiving unfair criticism,

receiving unfavorable schedules or work assignments . . . do not rise to the level of

adverse employment actions . . . because they [do] not have a material impact on

the terms and conditions of . . . employment."[78]  Courts require actions that are

more significant and permanent.[79]  It is well-established that Title VII "'does not

---

[75]      *Kassner v. Second Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir.
2007) (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.
2001)).

[76]      *Morrison v. Potter*, 363 F. Supp. 2d 586, 591 (S.D.N.Y. 2005)
(quotation marks and citations omitted).

[77]      *Bennett v. Watson Wyatt & Co.,* 136 F. Supp. 2d 236, 247 (S.D.N.Y.
2001).  *Accord White v. Fuji Photo Film USA, Inc.*, 434 F. Supp. 2d 144, 152
(S.D.N.Y. 2006).

[78]      *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005)
(quotation marks and citations omitted).

[79]      *See Phillips v. Bowen*, 278 F.3d 103, 117 (2d Cir. 2002) (holding that
there is no cause of action to "vindicate an employee's trivial complaints about an
unpleasant working environment"); *Bennett*, 136 F. Supp. 2d at 245 (holding that
plaintiff's alleged underutilization did not rise to the level of an actionable adverse
employment action).

-19-

set forth a general civility code for the American workplace.'"[80]

If the plaintiff succeeds in establishing a prima facie case, then the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.[81]  Finally, if the employer articulates a non-discriminatory reason for the challenged action, the burden shifts back to the plaintiff to demonstrate that the defendant's explanation was pretextual and/or that discrimination was a motivating factor.[82]

Under the *McDonnell Douglas* framework, an employee initially bears the burden of producing evidence sufficient to support a prima facie case of discrimination.[83]  However, such evidence need be no more than "minimal" or "de minimis."[84]  Once the plaintiff demonstrates a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the

---

[80]     *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 76 (2d Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). *Accord Kaytor*, 609 F.3d at 546.

[81]     *See Ruiz*, 609 F.3d at 492.

[82]     *See id.* at 493 ("A plaintiff can rebut the employer's proffered legitimate, non-discriminatory reason by proving that discrimination played a role in the employer's decision[.]").

[83]     *See McDonnell Douglas*, 411 U.S. at 802.

[84]     *See, e.g.*, *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).

differential treatment.[85]  "[T]he defendant must clearly set forth, through the

introduction of admissible evidence, the reasons for" its actions.[86]  If the

explanation is legitimate and nondiscriminatory, the burden shifts back to the

plaintiff to demonstrate that the defendant's proffered explanation is merely a

pretext for discrimination.[87]  "[P]laintiff bears the burden of proving not just

pretext, but racial discrimination . . . and thus the burden of pointing the court to

the existence of evidence that would raise a disputed issue of material fact on this

score."[88]

        Notably, in order to raise an issue of fact that is sufficiently material

to defeat a motion for summary judgment, the plaintiff must produce more than

simply some evidence; it must be enough evidence to support a rational finding

that the defendant's explanation for the adverse action is actually a pretext to

disguise discrimination.[89]  A plaintiff is required to do "more than cite to [his]

---

[85]     *See Ruiz*, 609 F.3d at 492.

[86]     *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981).

[87]     *See Patterson v. County of Oneida, New York*, 375 F.3d 206, 221 (2d Cir. 2004).  *See also Beachum v. AWISCO New York*, 785 F. Supp. 2d 84, 93-94 (S.D.N.Y. 2011).

[88]     *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 561 (S.D.N.Y. 2005).

[89]     *See Weinstock*, 224 F.3d at 42.  *See also Mavrommatis*, 2011 WL 3903429, at *2; *Ochei v. Coler/Goldwater Mem'l Hosp.*, 450 F. Supp. 2d 275, 283

mistreatment and ask the court to conclude that it must have been related to [his] race."[90]

"The factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination."[91]  The factfinder may disbelieve the defendant's explanation either because the facts underlying the explanation are false or because the explanation is weakened by inconsistencies or logical flaws.[92]  Therefore, the plaintiff can survive summary judgment if he produces facts sufficient to permit a reasonable factfinder to disbelieve the defendant's explanation in favor of the plaintiff's explanation that discrimination occurred.  The plaintiff can sustain this burden by proving that "the evidence in plaintiff's favor, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding that [the adverse employment decision] was motivated at least in part by . . .

_____

(S.D.N.Y. 2006).

[90]     *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001).

[91]     *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).  *Accord Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 134 (2000).

[92]     *See Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 110 (2d Cir. 2001) (stating that summary judgment for defendant was improper where the defendant's stated reasons for its actions lacked credibility due to inconsistencies).

discrimination."[93]

### b.   Protected Class

In 1976, the Supreme Court held that the terms of Title VII "are not limited to discrimination against members of any particular race."[94]  In describing Title VII, the Supreme Court cited *Griggs v. Duke Power Co.*,[95] wherein the Court stated: "Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed."[96]  Thus, it appears that the Supreme Court did not intend to limit the protections of Title VII to racial minorities only. In fact, the Court noted that the first prima facie element of a race discrimination case under *McDonnell Douglas v. Green*,[97] is "that [plaintiff] belongs to a racial minority."  The Court explained that this sample element

> was set out only to demonstrate how the racial characteristic of the discrimination could be established in the most common sort of case, and not as an indication of any substantive limitation of Title VII's prohibition of

---

[93]   *Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 114 (2d Cir. 2007).

[94]   *McDonald v. Santa Fe Rail Transp. Co.*, 427 U.S. 273, 278-79 (1976).

[95]   401 U.S. 424 (1971).

[96]   *Id.* at 431.

[97]   411 U.S. at 802.

racial discrimination.[98]

Despite this clear directive from the Supreme Court, the Second Circuit "has yet to expressly adopt a test for determining whether a non-minority plaintiff qualifies as a member of a protected group."[99]  While the Second Circuit may not have addressed this issue expressly, it certainly has done so implicitly. For example, in *McGuiness v. Lincoln Hall*,[100] the Circuit held that the plaintiff, a white woman, established a prima facie case of race and sex discrimination under Title VII when she alleged that a fellow employee, a similarly situated black man, received a better severance package.

> It is not contested that plaintiff is a white woman and that she was qualified for the position.  Furthermore, plaintiff has proffered evidence sufficient to allow a trier of fact to find that defendant offered her a different and less desirable severance package (one which involved less money) than it offered to plaintiff's colleague Carlton Mitchell, a black man who like plaintiff was an executive-level employee, and who was discharged two days after plaintiff.  Under the

---

[98]     *McDonald*, 427 U.S. at 279, n.6.  *Accord McDonnell Douglas*, 411 U.S. at 802 n.13 ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.").

[99]     *Adamczyk v. New York State Dep't of Corr. Servs.*, No. 07-CV-523S, 2011 WL 917980, at *5 (W.D.N.Y. Mar. 14, 2011) (citing *Tappe v. Alliance Capital Mgmt. L.P.*, 177 F. Supp. 2d 176, 181 (S.D.N.Y. 2001)).

[100]     263 F.3d 49 (2d Cir. 2001).

circumstances of this case, this evidence alone satisfied plaintiff's 'minimal' burden to establish a prima facie case that she was treated differently on the basis of her race *and* gender.[101]

More recently, the Second Circuit held that a plaintiff, a white male, established a prima facie case of race discrimination pursuant to 42 U.S.C. § 1981 ("section 1981") under the first step of the *McDonnell Douglas* burden-shifting framework.[102]  In *Broich*, the plaintiff was a Caucasian police officer who brought suit alleging that defendants discriminated against him on the basis of race when they promoted a black co-worker with less seniority to a detective position instead of him.

The court first addressed plaintiff's failure-to-promote claim under section 1981, noting that the first prima facie element of a section 1981 case requires a plaintiff to show is that he is a member of a "racial minority."  In a footnote, the court stated: "It is clear that § 1981 'protect[s] all persons, including whites, from discrimination on account of race.'"[103]  Apparently, the court failed to

---

[101]    *Id.* at 53 (emphasis added).

[102]    *See Broich v. Incorporated Vill. of Southhampton*, 462 Fed. App'x 39, 44 (2d Cir. 2012).

[103]    *Id.* at 42 (quoting *Keating v. Carey*, 706 F.2d 377, 383 n.9 (2d Cir. 1983) (citing *McDonald*, 427 U.S. at 295-96 (internal quotation marks omitted))).

reconcile the "racial minority" requirement with plaintiff's status as a white male.

The court then proceeded to analyze the second prima facie element of a section 1981 case – an intent to discriminate on the basis of race – by referring to Title VII.[104]  The court noted that in order to establish a prima facie case of employment discrimination under Title VII, a plaintiff must show, *inter alia*, that he belonged to a protected class.[105]  Again, without elaborating on this first element, the court held "that there is sufficient evidence for a factfinder to infer that [plaintiff] was passed over for promotion under circumstances giving rise to an inference of discrimination."[106]  Accordingly, the court found that the plaintiff established a prima facie case of employment discrimination pursuant to section 1981 for purposes of the first step of the *McDonnell Douglas* framework.[107]  In doing so, the court assumed that a white male plaintiff could satisfy all of the prima facie elements of a section 1981 case, including the first element.

In sum, given the implicit holding in *Broich*, coupled with the express

---

[104]    *See id.* ("A plaintiff's efforts to establish the second element of a § 1981 claim are subject to the same burden shifting analysis as intentional discrimination claims brought under Title VII . . . .").

[105]    *See id.*

[106]    *Id.* at 43.

[107]    *See id.* at 44.

language in *McDonald*, it is fair to assume that, in cases of "reverse

discrimination," a white plaintiff could satisfy the first prima facie element of a

race discrimination claim under Title VII whether that element is framed as "being

a member of a racial minority" or "belonging to a protected class."

### 2.    Statute of Limitations and Administrative Exhaustion

> Before an individual may bring a Title VII suit in federal
> court, the claims forming the basis of such a suit must first
> be presented in a complaint to the EEOC or the equivalent
> state agency.  In addition, the claimant must make the
> EEOC filing within 300 days of the alleged discriminatory
> conduct and, before bringing suit, must receive a 'Notice of
> Right to Sue' letter from the EEOC.[108]

However, when a claim alleges a hostile work environment, "the incidents

constituting a hostile work environment are part of one unlawful employment

practice" and "the employer may be liable for all acts that are part of this single

claim."[109]  Accordingly, under the continuing violation doctrine, "[i]n order for the

charge to be timely, the employee need only file a charge within . . . 300 days of

---

[108]    *Williams v. New York City Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (citing 42 U.S.C. § 2000e-5(e)(1) and *Legnani v. Alitalia Linee Aeree Italiane, S.P.A*, 274 F.3d 683, 686 (2d Cir. 2001)).  *Accord Alleyne v. American Airlines, Inc.*, 548 F.3d 219, 219 (2d Cir. 2008) (affirming district court's dismissal of plaintiff's discrimination claim where the alleged discriminatory act occurred more than three hundred days before plaintiff filed a complaint with the EEOC).

[109]    *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002).

any act that is part of the hostile work environment."[110]  Furthermore, the statute of limitations does not "bar an employee from using the prior acts as background evidence in support of a timely claim."[111]

The continuing violation doctrine does not apply to "discrete discriminatory acts" which "are not actionable if time barred, even when they are related to acts alleged in timely filed charges."[112]  The Supreme Court distinguishes discrete acts from acts contributing to a hostile work environment on the ground that creation of a hostile work environment "involves repeated conduct" such that "[t]he 'unlawful employment practice' . . . cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."[113]  Examples of discrete acts that are not covered by the continuing violation doctrine include "termination, failure to promote, denial of transfer, [and] refusal to hire."[114]

---

[110]   *Id.*

[111]   *Id.* at 113.

[112]   *Id.*

[113]   *Id.* at 115.

[114]   *Id.* at 114.

"Claims not raised in an EEOC complaint, however, may be brought in federal court if they are 'reasonably related' to the claim filed with the agency."[115]  The Second Circuit considers claims reasonably related when

> (1) the claim would fall within the reasonably expected scope of an EEOC investigation of the charges of discrimination; (2) it alleges retaliation for filing the EEOC charge; or (3) the plaintiff "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge."[116]

### 3.    Hostile Work Environment

To establish a *prima facie* hostile work environment claim under Title VII, a plaintiff must demonstrate (1) a defendant's conduct was so objectively severe or pervasive as to create an environment  that a reasonable person would find hostile and abusive, (2) that he subjectively perceived the environment to be hostile or abusive, and (3) defendant created said environment because of a plaintiff's protected status.[117]

---

[115]    *Williams*, 458 F.3d at 70.

[116]    *Alfano v. Costello*, 294 F.3d 365, 381 (2d Cir. 2002) (quoting *Butts v. New York Dep't of Hous., Pres. & Dev.*, 990 F.2d 1397, 1402-03 (2d Cir. 1993)), *superseded by statute on other grounds as stated in Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684 (2d Cir. 1998).

[117]    *See Patane v. Clark,* 508 F.3d 106, 113 (2d Cir. 2007) (citing *Gregory v. Daly,* 243 F.3d 687, 691–92 (2d Cir. 2001)).

In order to make out a successful hostile work environment claim, "the plaintiff must show that the workplace is permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"[118]  Thus, when workplace conditions are "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated."[119]  "Usually, a single isolated instance of harassment will not suffice to establish a hostile work environment unless it was 'extraordinarily severe.'"[120]

In *Williams v. New York City Housing Authority*, a New York appellate court held that under the NYCHRL a plaintiff is no longer required to show "severe and pervasive" conduct to establish a hostile work environment

---

[118]     *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993))

[119]     *National R.R. Passenger Corp.*, 536 U.S. at 116 (quoting *Harris*, 510 U.S. at 21).

[120]     *Howley*, 217 F.3d at 153 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)).

claim.[121]  The NYCHRL, though, is not a "'general civility code'"[122] and "petty

slights and trivial inconveniences"[123] are not actionable under it.[124]  In determining

whether a claim of hostile work environment survives summary judgment, the

relevant consideration is whether there is a triable issue of fact as to whether the

plaintiff "has been treated less well than other employees because of [his race]."[125]

"'Under the [NYCHRL], liability should be determined by the existence of unequal

treatment and questions of severity and frequency reserved for consideration of

damages.'"[126]

### 4.    Retaliation

"Title VII also makes it unlawful for an employer to discriminate

against an employee 'because he has opposed any practice made an unlawful

---

[121]     *See  Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 38 (1st
Dep't 2009).

[122]     *Id.* at 40 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S.
75, 81 (1998) (discussing Title VII)).

[123]     *Id.* at 41.

[124]     *Howley*, 217 F.3d at 153 (quoting *Cruz v. Coach Stores, Inc.*, 202
F.3d 560, 570 (2d Cir. 2000)).

[125]     *Williams*, 872 N.Y.S.2d at 39.

[126]     *Selmanovic v. NYSE Group, Inc.*, No. 06 Civ. 3046, 2007 WL
4563431, at *4 (S.D.N.Y. Dec. 21, 2007) (quoting *Farrugia v. North Shore Univ.
Hosp.*, 820 N.Y.S.2d 718, 725 (Sup. Ct. N.Y. Co. 2006)).

employment practice by this subchapter, or because [she] has made a charge . . . in an investigation, proceeding, or hearing under this subchapter.'"[127]  To establish a prima facie case of retaliation, a plaintiff must show:  "(1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action."[128]  An adverse employment action in the context of a Title VII retaliation claim is an action sufficiently severe to dissuade a reasonable worker from making or supporting a discrimination charge.[129]  "Title VII's anti-discrimination and anti-retaliation provisions 'are not coterminous;' anti-retaliation protection is broader and 'extends beyond workplace-related or employment-related retaliatory acts and harm.'"[130]

> "Proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees

---

[127]   *Kaytor*, 609 F.3d at 552 (quoting 42 U.S.C. § 2000e-3(a)).

[128]   *Id.*

[129]   *See Burlington N.*, 548 U.S. at 68.

[130]   *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quoting *Burlington N.*, 548 U.S. at 67).

who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."[131]

The three-step *McDonnell Douglas* burden-shifting analysis also applies to retaliation claims.[132] "At the summary judgment stage, if the plaintiff presents at least a minimal amount of evidence to support the elements of the claim, the burden of production shifts to the defendant to proffer a legitimate non-retaliatory reason for the adverse employment action."[133] "If the employer produces such evidence, the employee must, in order to avoid summary judgment, point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation was a 'substantial reason for the adverse employment action.'"[134]

### 5. Constructive Discharge

"An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so

---

[131]   *Id.* at 170 (quoting *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

[132]   *See Kaytor*, 609 F.3d at 552.

[133]   *Id.* at 552-53.

[134]   *Id.* at 553 (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

intolerable that he is forced to quit involuntarily."[135]  A "constructive discharge claim cannot be proved by demonstrating that an employee is dissatisfied with the work assignments [he] receives within [his] job title."[136]  "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."[137]

## C.   New York State Human Rights Law

The NYSHRL provides, in relevant part, "[i]t shall be an unlawful discriminatory practice . . . [f]or an employer . . . because of an individual's age, race . . . national origin . . . [or] sex . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."[138]  "The standards for recovery under New York State's Human Rights Law . . . are in accord with Federal standards

---

[135]   *Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003).

[136]   *Petrosino v. Bell Atl.*, 385 F.3d 210, 231 (2d Cir. 2004) (citing *Stetson v. NYNEX Corp.*, 995 F.2d 355, 360 (2d Cir. 1993)).

[137]   *Burlington N.*, 548 U.S. at 67-68.

[138]   N.Y. Exec. Law § 296(1)(a).

under [T]itle VII of the Civil Rights Act of 1964."[139]  In addition, the Second

Circuit has established that discrimination claims under the NYSHRL and the

NYCHRL are subject to the same "burden-shifting framework that the Supreme

Court articulated in *McDonnell Douglas*" for Title VII claims.[140]  Yet unlike Title

VII, liability under the NYSHRL "may be imposed on individuals."[141]

### D.   New York City Human Rights Law

The NYCHRL provides, in relevant part,

> [i]t shall be an unlawful discriminatory practice . . . [f]or an
> employer or an employee or agent thereof, because of the
> actual or perceived age, race . . . national origin, [or] gender
> [ . . . ] of any person, to [ . . . ] discharge from employment
> such person or to discriminate against such person in
> compensation or in terms, conditions or privileges of
> employment.[142]

"City HRL claims have typically been treated as coextensive with

---

[139]   *McQueen-Starling v. UnitedHealth Group, Inc. and Oxford Health Plans*, No. 08 Civ. 4885, 2010 WL 768941, at \*5 (S.D.N.Y. Mar. 8, 2010) (quoting *Ferrante v. American Lung Ass'n*, 90 N.Y.2d 623, 629 (1997) (quotation marks omitted)).

[140]   *Campbell v. Cellco P'ship*, 860 F. Supp. 2d 284, 294-96 (S.D.N.Y. 2012) (citations omitted).  *Accord Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010).

[141]   *Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012).

[142]   N.Y.C. Code § 8-107(1)(a).

state and federal counterparts.  However, the New York City Council has rejected such equivalence."[143]  By means of the Local Civil Rights Restoration Act of 2005 ("Restoration Act"),[144] the City Council "confirm[ed] the legislative intent to abolish 'parallelism' between the City HRL and federal and state anti-discrimination law."[145]  The NYCHRL must be construed "independently from similar or identical provisions of New York state or federal statutes."[146] "Interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of New York City Human Rights Law, viewing similarly worded provisions of federal and state civil rights laws as a floor below which the City's Human Rights law cannot fall."[147]  "'As a result of [the Restoration Act], the City HRL now explicitly requires an independent liberal construction analysis in all circumstances, even where state and federal civil rights laws have comparable language.'"[148]  However, for both discrimination and

---

[143]    *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009).

[144]    N.Y.C. Local Law No. 85 (2005).

[145]    *Loeffler*, 582 F.3d at 278.

[146]    Local Law 85, § 1.

[147]    *Id.*

[148]    *Loeffler*, 582 F.3d at 278 (quoting *Williams*, 872 N.Y.S.2d at 31).

retaliation claims under the NYCHRL, courts continue to apply the three-step, burden-shifting framework that the Supreme Court articulated in *McDonnell Douglas Corp. v. Green*.  The difference is that within that framework, courts must address the NYCHRL's "'uniquely broad and remedial' purposes, which go beyond those of counterpart [s]tate or federal civil rights laws."[149]  However, a plaintiff must demonstrate "by a preponderance of the evidence that [he] has been treated less well than other employees" due to unlawful discrimination.[150]

In stating a retaliation claim under NYCHRL, a plaintiff need not establish that an adverse action was materially adverse.  He need only establish that the action was "reasonably likely to deter a person from engaging in a protected activity."[151]

## IV.   DISCUSSION

### A.   The Discrimination Claims Are Barred, in Part, by the Statute of Limitations

As a threshold matter, a plaintiff may not bring a Title VII claim concerning events which occurred more than three hundred days prior to the filing

---

[149]   *Williams*, 872 N.Y.S.2d at 31 (quoting Local Law No. 85).

[150]   *Id.* at 39.

[151]   *Williams*, 872 N.Y.S.2d at 34.

of a Title VII charge with an agency authorized to hear such actions.[152]  Barounis

filed his discrimination charge with the EEOC on November 20, 2008 (the "EEOC

Charge").  Therefore, the three hundred-day statute of limitations bars Barounis's

recovery for any discriminatory acts occurring before January 25, 2008.[153]  As

such, plaintiff's allegations that he was denied overtime opportunities in 2006 and

2007 as evidence of his discrimination claim are time-barred.  However, because a

hostile work environment claim is comprised of a series of separate acts that

collectively constitute an unlawful employment practice, some of the component

acts can fall outside the statutory time period.[154]  Accordingly, I will evaluate

conduct occurring more than three hundred days prior to the filing of Barounis's

EEOC Charge to the extent it relates to his hostile work environment claim.

### B.     Barounis's Age Discrimination Claim Is Barred for Failure to Exhaust His Administrative Remedies

Defendants argue that Barounis's age discrimination claim was not

raised in his EEOC Charge and is therefore barred for failure to exhaust

---

[152]     42 U.S.C. § 2000e–5(e).

[153]     *See id.* § 2000e–5(e)(1).  *See also*, *e.g.*, *Harris v. City of New York*, 186 F.3d 243, 251 (2d Cir. 1999).

[154]     *See Gutierrez v. City of New York*, 756 F. Supp. 2d 491, 500-01 (S.D.N.Y. 2010) (citing *National R.R. Passenger Corp. v. Morgan,* 536 U.S. at 105).

administrative remedies.[155]  As an initial matter, Barounis did not check the box for

"age" on the cover sheet to his EEOC Charge of Discrimination.  The two-page

factual statement filed by Barounis supporting his EEOC Charge also contained no

allegations of discrimination on the basis of age.  The first references of age

discrimination are contained in the Complaint in this action.  Because Barounis's

age discrimination claim was not exhausted, or reasonably related to his race

discrimination claim, this Court lacks jurisdiction over this claim under Title

VII.[156]  Accordingly, summary judgment is granted as to this claim.

### C.    Race Discrimination

Barounis has satisfied the first two elements of his prima facie case of

race discrimination because he is a Caucasian male,[157] and it is uncontested that he

was qualified for the position that he held at the NYPD.  However, he has failed to

satisfy the third element showing that he suffered an adverse employment action.

A plaintiff sustains an adverse employment action if he suffers a

---

[155]    Plaintiff does not dispute this in his opposition papers.

[156]    *See Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*, No. 09
Civ. 9662, 2012 WL 2333303, at *9 (S.D.N.Y. June 19, 2012).

[157]    "[W]hite persons, as a class, are protected from discrimination against
that class. Thus, for the purposes of this summary judgment motion, plaintiff is
deemed to have met *McDonnell Douglas's* first requirement."  *Berkowitz v. County
of Orange*, 120 F. Supp. 2d 386, 397 (S.D.N.Y.  2000).

'materially adverse change' in the terms and conditions of his employment.[158] Barounis alleges that he was subjected to the following adverse employment actions: (1) being continuously yelled and screamed at by Lts. Algarin and Medina; (2) being placed in the minor violations log by Lt. Medina; (3) receiving a command discipline from Lt. Algarin; (4) being transferred from the midnight tour at the Bronx Task Force to the day tour at the 42 Precinct; (5) being served with Charges and Specifications for improperly working and/or documenting overtime; and (6) being found guilty of one of the four specifications.

Although Barounis has offered proof that Lts. Medina and Algarin were hostile to him by yelling at him in front of co-workers and giving him a hard time – this is not an adverse employment action.  The record reflects a number of disciplinary actions taken against Barounis, including being placed in the minor violations log and receiving a command discipline.   These cannot be considered adverse employment actions as neither led to any penalties, or loss in benefits or time.  Barounis admits that both Caucasian and Hispanic officers were also written up in the minor violations log.

Barounis has also failed to show that Lts. Algarin or Medina were

---

[158]   *See Gutierrez v. City of New York*, 756 F. Supp. 2d 491, 506 (S.D.N.Y. 2010).

responsible for his transfer, or where he was transferred to, following the investigation into the excessive overtime allegations.  Further, Cpt. Traynor and Lt. Medina were also transferred as a result of this investigation, making it even less likely that the individual defendants were responsible for Barounis's transfer or that it resulted from any racial animus.

Barounis next asserts that discipline relating to overtime abuse was based on false information provided by Lts. Medina and Algarin.  However, there is no evidence in the record to suggest that they were behind the anonymous calls to the IAB.   Nor is there evidence in the record to show that Barounis was subjected to harsher disciplinary actions than any of his other colleagues.  The investigation into Barounis's overtime included members of the Bronx Task Force.  Several people involved, both Caucasian and Hispanic, were transferred to other precincts or received other disciplinary actions as a result of the investigation.  The investigation included reviewing years of overtime records and interviews with many members on the Task Force.  It was the IAB who brought the Charges and Specifications against Barounis, not Lts. Medina or Algarin.  There is no evidence that beyond being interviewed during the investigation, Lts. Medina or Algarin had any role in the outcome of the investigation or the subsequent disciplinary recommendations.

It is possible, though not established, that Barounis was treated differently in some respects from other officers.  However, if such disparate treatment occurred, there is no proof that it was due to his membership in a protected class, rather than based on his own personality or actions. Because Barounis has not shown that he suffered an adverse employment action, he has not established a prima facie case of discrimination.  Accordingly, defendants' motion for summary judgment is granted as to the Title VII race discrimination claim.

###    D.    Hostile Work Environment

To establish his hostile work environment claim, Barounis must first show that defendants' conduct was so objectively severe or pervasive as to create an environment that a reasonable person would find hostile and abusive.  In support of his claim, Barounis points to evidence that defendants called him a "criminal" and a "thief" on several occasions, repeatedly told him he needed to retire or quit, yelled at him in front of peers and made comments like "the good old days of the good old white boys running the show here is over" and "I'm going to take care of some Hispanics, too."[159]  However, the comments related to race are no more than isolated instances of harassment and as such, cannot be

---

[159]    Pl. 56.1 ¶¶ 21-22.

considered "extraordinarily severe."[160]   Many of the comments, including

referring to Barounis as a "criminal" and a "thief", are directed to Barounis's

alleged overtime abuse and have nothing whatsoever to do with his race.

Barounis has certainly shown that the atmosphere created by Lts. Algarin and

Medina was not pleasant.  But there is no evidence that this unpleasant

environment was the result of discriminatory animus based on plaintiff's race.

Thus, the evidence does not support a finding that individual defendants' conduct

was sufficiently pervasive and sustained as to create a hostile work environment.

Defendants' motion with regard to Barounis's hostile work environment claim

pursuant to Title VII is granted.

### E.      Retaliation

It is undisputed that plaintiff engaged in a protected activity when he

complained, through counsel, to the Commissioner of the NYPD in August 2008

about discrimination based on race and national origin.  Barounis subsequently

filed an EEOC complaint of which the NYPD was aware.  Barounis argues that

the disciplinary charges and subsequent transfer to the day tour desk assignment at

the 42 Precinct was in retaliation for filing these complaints.  Defendants,

however, argue that there is insufficient evidence of a causal connection between

---

[160]      *Howley*, 217 F.3d at 153.

the protected activity and an alleged adverse employment action to survive

summary judgment.  As discussed above, the pattern of abuse that Barounis

describes fails to allege, in whole or in part, a materially adverse employment

action.  Therefore, I need not address whether there was a causal connection

between the protected activity and any adverse employment action.[161]

Accordingly, defendants' motion with regard to Barounis's Title VII retaliation

claim is granted.

### F.    Constructive Discharge

Barounis alleges constructive discharge by defendants in their

decision to transfer him to another precinct and by filing disciplinary charges

against him that resulted in a probationary termination period.  Although lateral

transfers frequently are not considered materially adverse in the Second Circuit,

"[a] lateral transfer that does not result in a reduction in pay or benefits may be an

adverse employment action so long as the transfer alters the terms and conditions

of the plaintiff's employment in a materially negative way."[162]  While plaintiff's

decision to retire may have been a fitting response to this combination of events, it

---

[161]    *See Kaytor*, 609 F.3d at 546.

[162]    *Patrolmen's Benevolent Ass'n of N.Y. v. City of New York*, 310 F.3d 43, 51 (2d Cir. 2002).

-44-

certainly cannot be said as a matter of law that the conditions of his employment were so intolerable that a reasonable person would have felt compelled to resign. Barounis was not demoted or terminated, he was simply transferred. Barounis has offered no evidence that his new precinct was a step down in any way from his previous Task Force assignment. Further, Barounis was not the only person in his precinct to be transferred as a result of the excessive overtime investigation – Lt. Medina (a Hispanic male) and Cpt. Traynor (a Caucasian male) were transferred as well. Barounis has offered no evidence that his new assignment was different or worse than his colleagues who were transferred. Accordingly, defendants' motion with regard to Barounis's constructive discharge claim is granted.

### E.    NYSHRL Claims

As the NYSHRL analysis parallels the Title VII analysis, Barounis has failed to provide sufficient evidence of discrimination, hostile work environment or retaliation. Therefore, these claims fail under the NYSHRL.

### F.    NYCHRL Claims

Unlike Barounis's state law claims under the NYSHRL, his claims under the NYCHRL are not analyzed under a framework identical to that applied

for their federal claims.[163]  "Thus, less egregious conduct than that required under Title VII may support a claim of employment discrimination under the NYCHRL."[164]  However, a district court may decline supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction or "the claim raises a novel or complex issue of State law."[165]  With all federal claims dismissed, I decline to exercise supplemental jurisdiction over Barounis's NYCHRL claims. Accordingly, Barounis's NYCHRL claims are dismissed without prejudice.

### G.    Claims Against the NYPD

Section 396 of the New York City Charter ("Charter") indicates that the NYPD is a non-suable entity.  "All actions and proceedings for the recovery of penalties . . . shall be brought in the name of the City of New York and not that of any agency, except where otherwise provided by law."[166]  Thus, the City of New

---

[163]    *See Adams v. City of New York*, 837 F. Supp. 2d 108, 127 (E.D.N.Y. 2011).

[164]    *Woodard v. TWC Media Solutions, Inc.*, No. 09 Civ. 3000, 2011 WL 70386, at *9 (S.D.N.Y. Jan. 4, 2011).

[165]    28 U.S.C. § 1367(c).

[166]    Charter, Ch. 17 § 396.

York is the proper defendant and the claims against the NYPD are dismissed.[167]

Barounis has offered no evidence of any policy, practice or custom that the City

engages in with respect to the hiring, training, supervision or direction of its

employees.[168]   Accordingly, plaintiff's claims against the City are dismissed.

## V.    CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment

is granted.  The Clerk of the Court is directed to close this motion [docket # 33]

and this case.

---

[167]    *See Gutierrez*, 756 F. Supp. 2d at 499; *Neishlos v. City of New York*,
No. 00 Civ. 914, 2003 WL 22480043, at *1 (S.D.N.Y. Nov. 3, 2003).

[168]    *See Monell v. Department of Soc. Servs.,* 436 U.S. 658, 692–94
(1978).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            December 12, 2012

## Appearances

**For Plaintiff:**

Albert A. Breud, II, Esq.
Law Offices of Albert Adam Breud, P.L.L.C.
356 Veterans Memorial Highway, Suite 8n
Commack, NY 11725
(631) 543-3030

**For Defendant:**

Daniel S. Gomez-Sanchez
Donna A. Canfield
John S. Schowengerdt
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, NY 10007
(212) 788-0883